DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**STUART N. BORNSTEIN,**
Appellant,

v.

**IRA MARCUS,** individually, **IRA MARCUS, P.A.,** a Florida corporation,
and **GRANADA, LLC,** a Florida limited liability company,
Appellees.

No. 4D13-4098

[July 22, 2015]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Carlos Rodriguez, Judge; L.T. Case No. CACE 10-046657 (14).

Xavier A. Franco and George E. McArdle of McArdle & Perez, P.A., Coral Gables, for appellant.

Robert M. Klein and Mark J. Sullivan of Klein Glasser Park Lowe & Pelstring, P.L., Miami, for appellees Ira Marcus and Ira Marcus, P.A.

LEVINE, J.

The issue for our consideration is whether the trial court erred in striking appellant's pleadings as a "sham" and entering a final judgment in favor of a law firm and its principal. The complaint centered on whether appellant deserved credit for $50,000 paid to the firm. The trial court found that appellant's claim was a sham because only appellant's company had the right to bring the claim since appellant treated the $50,000 as a capital contribution to the company. We find the trial court erred in striking the pleading as a sham because the record does not support the trial court's conclusion that the pleading was a sham. As a result, we reverse and remand. We also reverse the trial court's dismissal of certain tort claims under the economic loss rule, as the Florida Supreme Court recently clarified that the rule is limited to the products liability context.

In 2009, appellant Stuart Bornstein, Alan Potamkin, and their company Granada, LLC, entered into a retainer and contingent fee

agreement with appellee Ira Marcus, P.A., for legal representation with a claim against the City of Coral Gables. Pursuant to the fee agreement, the firm would be entitled to 40% of the gross recovery. Additionally, the firm was to be paid two retainers totaling $50,000. The firm was also to be paid $28,150 for past due billings and $10,000 for expert witness fees. $50,000 would be applied as a credit against any recovery. Appellant signed the fee agreement individually and as a managing member.

Appellant wrote checks to the firm for $23,150, $10,000, and $5,000. Granada wrote checks to the firm for $30,000 and $40,000. After appellant sent a check to the firm for $23,150, appellant sent an e-mail saying, "I messed up giving u my personal check. I should have written it to Granada and cut u a check from Granada. Not a big deal, I can clear that up later if necessary."

In 2010, the City offered to settle the case for $1.45 million. Although under the fee agreement the firm would have been entitled to $580,000, in order to promote acceptance of the settlement, the firm agreed to reduce its fees to $450,000. Appellant agreed to the settlement, and the firm sent Granada $880,816, after subtracting $450,000 for fees and $119,184 in other expenses.

Thereafter, in a series of e-mails, appellant claimed that pursuant to their fee agreement, the firm should have credited the $50,000 retainer against the $450,000 agreed fee, and the firm should have retained only $400,000 from the settlement. The firm disagreed, claiming that it already lowered its fee from $580,000 to $450,000.

Appellant filed a complaint against the firm and its principal, asserting causes of action for breach of contract, breach of fiduciary duty, conversion, and civil theft. Appellant claimed that the firm failed to credit the $50,000 retainer against the fee award as required by the fee agreement. An amended complaint added Granada as a plaintiff.

The firm moved to dismiss the tort claims under the economic loss rule because they were based on a duty created solely by contract. The court granted the motion with prejudice as to the counts against the firm for breach of fiduciary duty, conversion, and civil theft. The court denied the motion as to the count against the firm for breach of contract and the counts against the firm's principal for breach of fiduciary duty, conversion, and civil theft.

Subsequently, during discovery at a deposition, appellant admitted that he treated the $50,000 payment to the firm as a capital contribution to

2

Granada on his tax return. Appellant denied that he got the return of the $50,000 capital contribution when he received his distribution of $330,000 from the approximately $880,000 settlement. When the firm asked, "And you received a return of that ["$55,000 capital contribution made in 2009"] when you got the distribution of $330,000," appellant answered, "Right." Later, however, when the firm asked, "So, if the $50,000 was part of your capital, you got it returned when you got the distribution," appellant responded, "That's absurd. I don't think anybody in this room believes that."

A year later, the firm filed a sworn motion to strike the amended complaint as a sham pursuant to rule 1.150. The firm claimed that appellant filed the complaint asserting that the funds belonged to him personally, when in fact appellant no longer had any claims to the funds since he treated the funds as a capital contribution to Granada. In sum, the firm argued that if the funds were appellant's capital contribution to Granada, then appellant no longer had a claim to the funds and Granada would be the correct party to bring the action. The firm claimed that the sham emanated from the fact that appellant swore under oath that the funds were a capital contribution to Granada, while his complaint asserted a personal claim for the return of the funds.

After an evidentiary hearing, the trial court entered an order granting the firm's motion to strike appellant's pleadings and entered a final judgment. The trial court found that appellant's action was based on his claim that the $50,000 retainer belonged to him. The trial court determined that the tax returns and appellant's testimony showed that the funds were a capital contribution to Granada, and as such, only Granada had the right to bring a claim. The trial court found that there were "patently inconsistent factual conflicts" in the record.

Appellant argued later in a motion for rehearing that the firm failed to meet the high standard on a motion to strike. The trial court denied the motion for rehearing, stating that "the Court is convinced that the claims stricken by the Court were 'inherently false and clearly known to be false at the time the pleading was made.'" From that ruling, this appeal follows.

An order striking a pleading as a sham is reviewed for abuse of discretion. *Gonzalez v. City of Homestead*, 825 So. 2d 1050, 1054 (Fla. 3d DCA 2002).

A trial court may strike a party's pleading if deemed by the trial court as a sham under Florida Rule of Civil Procedure 1.150, which provides as follows:

3

(a) Motion to Strike.  If a party deems any pleading or part thereof filed by another party to be a sham, that party may move to strike the pleading or part thereof before the cause is set for trial and the court shall hear the motion, taking evidence of the respective parties, and if the motion is sustained, the pleading to which the motion is directed shall be stricken.  Default and summary judgment on the merits may be entered in the discretion of the court or the court may permit additional pleading to be filed for good cause shown.

A pleading is considered a sham only "when it is palpably or inherently false, and from the plain or conceded facts in the case, must have been known to the party interposing it to be untrue." *Rhea v. Hackney*, 157 So. 190, 193 (Fla. 1934).  Thus a sham pleading is one "good on its face but absolutely false in fact." *Id.* at 194.

For a trial court "to justify the striking of a pleading for being sham or false it must be so undoubtedly false as not to be subject to a genuine issue of fact." *Meadows v. Edwards*, 82 So. 2d 733, 735 (Fla. 1955).  The motion to strike a pleading as being a sham "should be tested by the same standards as a motion for a summary judgment . . . ." *Id.*  For a trial court to strike a pleading as a sham the "falsity thereof [must] clearly and indisputably appear[]. . . . [I]t must evidently be a mere pretense set up in bad faith and without color of fact." *Rhea*, 157 So. at 193.  Finally, "[i]n reviewing a motion to strike a pleading as sham all doubts are to be resolved in favor of the pleading." *Furst v. Blackman*, 819 So. 2d 222, 225 (Fla. 4th DCA 2002).

In *Furst*, the plaintiff sued alleging that he wired money to be invested but instead the defendant used the funds for his own benefit.  The trial court struck the pleading as a sham because of the inconsistencies between the affidavit where the plaintiff claimed the monies were an investment and the amended complaint where the plaintiff claimed the monies were a loan.  The trial court found that the plaintiff had "deliberately made contradictory and inconsistent statements in an effort to interfere with the orderly process" of the trial court. *Id.* at 223.

This court reversed and determined that the pleading was not "undoubtedly false."  This court concluded that the amended complaint

was not a sham under these standards.  Although plaintiff's affidavits did not say that this was a loan, but rather referred to this as an investment, neither of the affidavits said that

4

plaintiff was to be issued stock . . . . The term "investment," used in the affidavits, is not entirely incompatible with a loan. The "investment" could have been for the purpose of earning interest from a loan or for appreciation in value of stock.

*Id.* at 226. This court concluded that the affidavits and complaint were not so inconsistent to make the pleadings "'undoubtedly false' and known to be so." *Id.* at 224.

In the present case, the record does not show the pleadings were "undoubtedly false." Appellant was, in fact, a client of the firm along with Granada and Potamkin. Appellant and Granada paid funds directly to the firm pursuant to a fee agreement. The fee agreement stated that the clients—which included appellant, Granada, and Potamkin—would receive a $50,000 credit towards any recovery. In the amended complaint, appellant and Granada claimed they did not receive the credit that was due to them under the fee agreement. In the present case, appellant's pleadings could not be said to be a "mere pretense set up in bad faith and without color of fact." *See Rhea,* 157 So. at 193.

Simply because appellant may have transferred $50,000 to Granada as a capital contribution does not mean that the pleadings are a sham. This is especially true because such a transfer would not necessarily prohibit appellant from bringing the action. For example, in *One Country, LLC v. Johnson,* 101 A.3d 933, 939 (Conn. 2014), a plaintiff who paid a bank $300,000 to satisfy a loan default brought an action against the defendant to enforce a guarantee. The defendant argued that the plaintiff lacked standing because the plaintiff treated the $300,000 as a capital contribution to his company. The Connecticut Supreme Court rejected this argument and concluded that the tax treatment did not affect the plaintiff's rights under the guarantee agreement and that the defendant's obligation ran to the plaintiff personally. "[T]he fact that the plaintiff claimed a tax deduction for a loss does not preclude him from subsequently seeking to recover from a party indebted to him for that loss." *Id.* at 940-41. Following the logic of *One Country,* appellant's tax treatment of the $50,000 would not necessarily act as a bar to his standing to enforce rights to claim the credit allegedly owed to him and therefore his pleading would not be a sham under rule 1.150.

In his second issue on appeal, appellant challenges the trial court's dismissal of his tort claims against the firm, asserting that the economic loss rule does not bar claims for breach of contract, conversion, and civil theft. Appellant argues that the supreme court recently curtailed the economic loss rule in *Tiara Condominium Ass'n v. Marsh & McLennan Cos.,*

110 So. 3d 399 (Fla. 2013). We agree and, as such, we reverse the trial court's dismissal of these claims.

"[T]he economic loss rule is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses." *Id.* at 401. "The rule has its roots in the products liability arena, and was primarily intended to limit actions in the products liability context." *Id.* Despite its underpinnings in the products liability context, courts have expanded the rule to other torts. *Id.* at 405. To correct this "unprincipled expansion" of the rule, the supreme court in *Tiara* "recede[ed] from [its] prior rulings to the extent that they have applied the economic loss rule to cases other than products liability." *Id.* at 406-07. The court made clear that "the economic loss rules applies only in the products liability context." *Id.* at 407. Because the instant case does not involve products liability, the trial court erred in dismissing the tort claims against the firm under the economic loss rule.

In conclusion, we find that the trial court erred in dismissing appellant's tort claims against the firm. We also find that the trial court erred in dismissing the pleading as a sham and entering final judgment for the law firm and its principal. Accordingly, we reverse and remand for further proceedings.

*Reversed and remanded.*

WARNER and CONNER, JJ., concur.

\*     \*     \*

**Not final until disposition of timely filed motion for rehearing.**